## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDRIA HOLLOWAY ) | Case No. 21-CV-3858 (AMD) (CLP) |
| Plaintiff, ) | |
| v. ) | FIRST AMENDED COMPLAINT |
| ) | |
| ) | JURY TRIAL DEMAND |
| CITY OF NEW YORK; ) | |
| NEW YORK CITY POLICE ) | |
| DEPARTMENT CAPTAIN TARIK ) | |
| SHEPPARD, ) | |
| in his individual capacity; ) | |
| JOHN AND JANE DOES #1-50 ) | |
| Defendants. ) | |
| _____) | |

### PRELIMINARY STATEMENT

1.     In the aftermath of the police killings of George Floyd and Breonna Taylor, thousands of New Yorkers participated in daily protests for several months against racist police violence and brutality. Consistent with its longstanding pattern and practice, the New York Police Department ("NYPD") and its officers responded to the protests with violence: Officers repeatedly and without cause or justification brutalized (with batons, fist strikes, pepper spray, and other physical force), detained, and arrested hundreds of protestors, medical and legal workers, and bystanders at protests. The NYPD's sole purpose was to suppress and terrorize protesters.

1

2.      Alexandria Holloway was one of many New Yorkers who was violently attacked and unlawfully arrested by the NYPD. While Ms. Holloway was peacefully protesting in Brooklyn, a NYPD officer charged at her, tackled her to the ground, and beat her with his baton. The attacking officer then arrested her without cause. Ms. Holloway subsequently asked a commanding officer, NYPD Captain Tarik Sheppard, why he was allowing officers to violently arrest peaceful protestors. Captain Sheppard responded by calling her a "bitch" and slamming her head into the window of a bus. As a result of this brutal attack, Ms. Holloway suffered physical and emotional injuries, including nerve and optical damage, that threaten her career as a professional photographer. Ms. Holloway seeks monetary damages for the violation of her common law, statutory, and constitutional rights.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), and over to Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      Venue lies in the Eastern District of New York under 28 U.S.C.§ 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claim occurred in the District.

## PARTIES

5.     Plaintiff Alexandria Holloway is a 34-year-old woman. She is—and, at all times discussed herein, was—a resident of Brooklyn, New York.

6.     Defendant City of New York is a municipal entity created and authorized under the laws of the State of New York. Defendant City of New York can be sued in its own name. Defendant City of New York is authorized by law to maintain a police department—the NYPD—which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant City of New York was at all times discussed herein the public employer of Defendants NYPD Officers John and Jane Does #1-50.

7.     Defendant NYPD Captain Tarik Sheppard, tax identification number 955351, was at all times relevant to this Complaint, a police captain employed by Defendant City of New York. In this role, Captain Sheppard was a duly appointed and acting officer, servant, employee, and/or agent of Defendant City of New York. At all relevant times, he was acting within the scope of his employment and under color of state law.

8.     Defendants NYPD Officers John and Jane Does #1-50 are uniformed members of the NYPD whose identities are unknown at this time and who, on information and belief, are assigned to various NYPD precincts throughout

3

Brooklyn. Defendants John and Jane Does were at all times relevant and discussed herein acting under color of law; in the course and scope of their duties and functions as officers, agents, servants and employees of Defendant City of New York; and was acting for, and on behalf of, and with the power and authority vested in them by Defendant City of New York and the NYPD. They are sued in their individual capacities.

## JURY DEMAND

9.  Plaintiff Alexandria Holloway demands a jury trial.

## STATEMENT OF FACTS

### I.  NYPD's Unlawful and Unconstitutional Conduct During the Cadman Plaza Protest

10.   Plaintiff Alexandria Holloway is a New York City based photographer. Her photography has appeared in major magazines, including Esquire, Harper's Bazaar, and Women's Health.

11.   On June 3, 2020, Ms. Holloway attended a peaceful protest march with over a thousand other New Yorkers, which began at Barclays Center in Brooklyn and ended at Cadman Plaza West and Tillary Street ("Cadman Plaza Protest").

12.   The protesters were loudly and conspicuously demonstrating against police violence and brutality.

13.     At 8:00 p.m., a citywide curfew went into effect.

14.     When the protestors reached Cadman Plaza, they encountered a line of NYPD officers blocking their route onto the Brooklyn Bridge.

15.     Some of the protestors attempted to speak with NYPD officers at the scene to request that the group be allowed to proceed onto the Bridge.

16.     When it became clear that NYPD officers would not allow the protestors to continue onto the bridge, some of the protestors began to disperse.

17.     Ms. Holloway and the other protestors who did not disperse remained assembled in Cadman Plaza.

18.     Thereafter, a large group of NYPD officers approached from the rear and surrounded the remaining protestors.

19.     Suddenly, at approximately 9:00 p.m., around the time when it began to rain, the NYPD officers, without provocation, began to charge at the protesters, screaming at them to "move," shoving them as they attempted to flee, and beating them with batons. [1]

20.     The officers did not give a dispersal order, or any other directives, to the protestors before they charged at and began beating them.

---

[1] The NYPD officers involved in the attack are named here as Defendants NYPD Officers John and Jane Does #5-50.

21.     The rain became heavy as the incident unfolded.

22.     The officers took advantage of the weather conditions and decreased visibility to sow confusion and act with impunity.

23.     After charging at, assaulting, and beating the protesters, the officers began indiscriminately arresting them.

24.     The officers had no cause or justification for arresting the protestors.

25.     At no time during the Cadman Plaza Protest were NYPD officers in physical danger, let alone imminent danger.

26.     There was no violence and no threat of violence—other than by the NYPD—when NYPD officers charged into the crowd and started beating protesters.

27.     There was no violence and no threat of violence—other than by the NYPD—as the officers continued to beat protesters until the crowd fully dispersed.

28.     There was no violence and no threat of violence—other than by the NYPD—as the officers arrested protestors whom they previously beat.

29.     New York City Public Advocate Jumaane Williams was present at the protest and livestreamed portions of it on Twitter.

30.     Public Advocate Williams repeatedly stated, live on video, that the protest was exclusively peaceful and that no violence or looting was occurring.

6

31.     As he watched police manhandle peaceful protesters, Public Advocate Williams repeatedly asked them, "Why?" He got no response.

32.     Ms. Holloway was one of many peaceful protestors at the Cadman Plaza Protest who was attacked, brutalized, and arrested by NYPD officers.

## II.     NYPD Officers Battered, Unlawfully Arrested, and Interrogated Plaintiff Holloway

33.     At or around 9:00 p.m., after NYPD officers began their brutal assault on peaceful protestors, Defendant NYPD Officer John Doe #1 ("Defendant John Doe #1"), a white male with black hair and dressed in riot gear, charged at Ms. Holloway with his baton and violently pushed her to the ground.

34.     Ms. Holloway was peacefully walking down Cadman Plaza with other protestors when Defendant John Doe #1 violently pushed her to the ground.

35.     Ms. Holloway posed no threat to Defendant John Doe #1 when he violently attacked and pushed her to the ground.

36.     After pushing Ms. Holloway to the ground, Defendant John Doe #1 struck her multiple times in her head, arms, shoulders, and back with his baton.

37.     During the attack, Ms. Holloway laid on the ground, with her eyes closed and hands over her head, in order to limit the impact of Defendant's strikes.

38.     After beating Ms. Holloway multiple times with his baton, Defendant John Doe #1 handcuffed Ms. Holloway.

39.     Defendant John Doe #1 fastened the handcuffs so tight that they caused Ms. Holloway's wrists to bruise.

40.     Two female NYPD officers, Defendant NYPD Officer Jane Doe #2 and Defendant NYPD Officer Jane Doe #3 ("Defendants Jane Does #2 and #3"), assisted Defendant John Doe #1 in arresting Ms. Holloway.

41.     Defendant John Doe #1 handed Ms. Holloway to Defendants Jane Does #2 and #3, who secured Ms. Holloway's handcuffs to their persons and walked her to a bus that would transport her to a jail.

42.     Defendant John Doe #1 and Defendants Jane Does #2 and #3 did not tell Ms. Holloway why she was being arrested or advise her of her rights.

43.     No NYPD officer gave Ms. Holloway a dispersal order before she was attacked and arrested.

44.     Ms. Holloway was not violent and posed no threat of violence before, during, or after she was attacked and arrested by NYPD officers.

45.     While Defendants Jane Does #2 and #3 were walking Ms. Holloway to the bus, Ms. Holloway asked NYPD Captain Tarik Sheppard why he was allowing NYPD officers to violently arrest peaceful protestors.

46.     Captain Sheppard responded by calling Ms. Holloway a "bitch" and slamming her head into the window of the transportation bus.

47.     Ms. Holloway was handcuffed when Captain Tarik Sheppard slammed her head into the bus.

48.     Ms. Holloway was then placed into the bus and taken to New York City Police Central Booking in Brooklyn ("Central Booking").

49.     No NYPD officer offered or provided medical aid to Ms. Holloway.

50.     While Ms. Holloway was being booked at Central Booking, NYPD officers searched her person and seized her personal property.

51.     After Ms. Holloway was booked, NYPD Detective Wendell Stradford directed her to a small room in the precinct and interrogated her.

52.     Detective Stradford did not advise Ms. Holloway of her rights— including providing a *Miranda* warning or advising her of her right to counsel— before interrogating her.

53.     Ms. Holloway did not consent to the interrogation.

54.     After Detective Stradford interrogated Ms. Holloway, she was taken to a holding cell, where she remained until her release.

55.     Ms. Holloway was not offered a phone call and was deprived of meaningful access to food, water, bathroom, soap, other hygiene products, and other basic necessities while she was incarcerated.

56.     Ms. Holloway was released from Central Booking at 4 a.m., seven hours after she was arrested.

57.     Ms. Holloway sustained physical and emotional injuries as a result of the unlawful police conduct described.

58.     Her physical injuries include, but are not limited to, concussions; bruising; bodily pain, including headaches and neck pains; and nerve and optical damage, which threaten her career as a professional photographer.

59.     Since Ms. Holloway was assaulted, beaten, and jailed by NYPD officers, she has had to reduce the number of days she works per week, and her ability to perform routine work functions has been impaired.

60.     Ms. Holloway cannot, for instance, use ladders when conducting photoshoots (an integral part of her job) and must take frequent rest breaks during work to accommodate her symptoms.

61.     Additionally, Ms. Holloway has been forced to limit the amount of time she spends reading, using the computer, and traveling by train and car, because they cause her pain, nausea, and fatigue.

62.    Ms. Holloway's mental and emotional health has also been impaired. She has, among other things, endured mental and emotional anguish and increased anxiousness when she is in large groups or in the vicinity of police officers.

### III.    NYPD Systematically Used Excessive Force and Unlawful Detentions and Arrests to Suppress the Widespread Protests that Occurred After the Police Killings of George Floyd and Breonna Taylor

63.    Ms. Holloway's experience was not unique. NYPD systematically used excessive force and unlawful detentions and arrests to suppress large-scale protests that occurred in the wake of the police killings of George Floyd and Breonna Taylor. The protests began on May 28, 2020 and continued on a near-daily basis in every borough of New York City for several months thereafter (the "Protests").

64.    Like the Cadman Plaza Protest, the vast majority of the Protests were peaceful: NYPD Commissioner Dermot F. Shea acknowledged that New Yorkers who attended the protests "overwhelmingly [] are good people coming out to voice their opinion." NYPD Chief Terence A. Monahan also admitted in a public statement that "the vast majority of people are out there to express their views."

65.    In response to these largely peaceful Protests, and like the Cadman Plaza Protest, NYPD officers repeatedly and without justification used batons, fist strikes, pepper spray, and other physical force, all of which constitute excessive

force, against people peacefully protesting police brutality, continuing its custom, policy, or usage of suppressing peaceful protests with excessive force.

66.    The NYPD also effected mass arrests and detained protesters without cause or justification, continuing its custom, policy, or usage of suppressing peaceful protests with unlawful detentions and arrests.

67.    In July 2020, the New York State Attorney General (the "AG") issued a preliminary report on the NYPD's response to the Protests ("AG Report").[2]

68.    The AG Report found that most complaints received by the AG were allegations of excessive force— against protestors, the press, legal observers, elected officials, and essential workers—and unlawful arrests.

69.    The AG received more than 100 phone calls and over 1,200 written complaints about unlawful NYPD protest-related conduct during the first two months of the Protests.[3]

70.    "Most of the complaints [the AG] received were about allegations of NYPD officers using excessive force against protesters, including use of batons and

---

[2] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020), https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

[3] *Id.* at 5.

indiscriminate use of pepper spray, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[4]

71.   "The []AG received complaints and heard extensive testimony at its public hearing about a tactic NYPD used whereby officers surrounded and blocked protesters, preventing them from leaving an area without making direct contact with police officers. According to witnesses, this practice often led to violent clashes between NYPD and protesters."[5]

72.   "The []AG received a significant number of complaints about troubling arrest-related practices, including, among others, using extremely tight zip ties to restrict hands, transporting protesters long distances to arrest processing centers, holding protesters for a significant amount of time after arrest, misgendering detainees, and holding protesters in cramped cells under unsafe conditions in light of the ongoing COVID-19 pandemic."[6]

73.   The NYC Department of Investigation made similar findings in a December 2020 report ("DOI Report").[7]

_____

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] New York City Department of Investigations, *Investigation into NYPD Response to the George Floyd Protests* (Dec. 2020),

74.     The DOI Report concluded, inter alia, that "the force required to carry out a mass arrest was disproportionate to the identified threat, placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[8]

75.     The Report also found that between May 28 and June 20, the Civilian Complaint Review Board ("CCRB") received 1,646 protest-related complaint: "Force allegations comprised the largest number of allegations (1,052 in total)."[9]

76.     In September of 2020, Human Rights Watch issued a detailed analysis of a June 4, 2020 protest in the Mott Haven neighborhood of the Bronx ("HRW Report")[10]. The report described the preplanned and coordinated disruption of the march by the NYPD, including by Chief Monahan who was at the protest.

77.     The HRW Report describes the systematic "kettling" of protesters before the 8:00 p.m. curfew and NYPD's use of excessive force and mass arrest of

---

https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[8] *Id.* at 56.

[9] *Id.*

[10] Human Rights Watch, *"Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States* (Sept. 2020), https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

protestors, as well as medical workers and legal observers, who were classified as essential workers exempt from the curfew.

78.     Numerous lawsuits, including one by the AG, have been filed challenging NYPD's use of excessive force and unlawful detentions and arrests during the Protests. *See, e.g.*, *People of the State of New York v. City of New York, et al.*, 21-cv-0322, Doc. 51 (S.D.N.Y.) (First Amended Complaint).

79.     The AG's Complaint details NYPD's widespread use of excessive force against peaceful protestors during the Protests. For example:

a.  At a May 28 protest at Union Square, NYPD Officers repeatedly rammed their bicycles into peaceful protestors. *Id.* ¶¶ 128-132.

b.  At a May 29 protest in Clinton Hill, NYPD officers, without warning or provocation, repeatedly charged into a crowd of protestors and hit them with batons, causing at least one protestor to bleed profusely and sustain a concussion. *Id.* ¶¶ 133-138.

c.  On the same night, at a different protest in Bedford-Stuyvesant, Brooklyn, NYPD officers charged into a group of peaceful protestors gathered on a sidewalk, causing some to fall to the ground. As one protestor laid on the ground, a NYPD officer swung a baton overhead and hit the protestor, causing a two-inch laceration on her forehead that bled profusely. *Id.* ¶¶ 141-146.

15

d.  At a May 31 protest, on or around Broadway and East 11th Street in Manhattan, NYPD Officers in riot gear blocked the path of protestors and ordered them to disperse. Officers then charged into the crowd of protestors, striking them with their shields and batons. *Id.* ¶¶ 155-160.

e.  At a June 4 protest in the Mott Haven Neighborhood of the Bronx:

> NYPD Officers, including at least one supervisor, sat on top of a parked car. Beneath them stood a large group of protesters who were barricaded in by NYPD Officers and prevented from exiting the area. The NYPD Officers perched on the car swung their batons at the heads of protesters standing below and dispersed pepper spray into the crowd. *Id.* ¶ 169.
>
> . . .
>
> During the Protests, NYPD Officers engaged in a pattern or practice of using pepper spray indiscriminately against protesters who were not posing a threat to any individual or actively resisting arrest. *Id.* ¶ 171.

80.  The AG's Complaint details numerous other instances of NYPD officers using excessive force during the Protests, including indiscriminate use of pepper spray; striking protestors with batons and other objects; and shoving, ramming, and charging at protestors.

81.  The AG's Complaint also details NYPD's widespread use of unlawful arrests during the Protests:

16

a. Throughout the Protests, NYPD officers wrongfully arrested individuals exempt from the Curfew Orders, including legal observers, medics, jail support providers and other essential workers. *Id.* ¶¶ 262-323.

b. At a June 3 protest in Midtown Manhattan, NYPD officers surrounded a group of peaceful protestors around East 54th and Third Avenue, and without warning charged into protesters from all sides and used excessive force while making unlawful arrests. *Id.* ¶¶ 347-354.

c. On June 4, in South Williamsburg, NYPD officers blocked the path of about 400 marching protesters. The Officers did not give protesters warning or a dispersal order before charging into the crowd, indiscriminately throwing protesters to the ground, beating them with batons, and arresting them. *Id.* ¶¶ 355-365.

d. At a June 4 protest in Mott Haven, NYPD Officers surrounded protestors such that they were not able to leave, brutalized, and unlawfully arrested over 250 individuals. *Id.* at 366-387.

82.    The DOI Report, AG Report, HRW Report, and lawsuits filed following the Protests document the NYPD's persisting policy and practice of violently suppressing peaceful protest with excessive force and unlawful arrests.

17

**IV.    The NYPD Has a History of Responding to Peaceful Protests with Excessive Force and Unlawful Arrests. Defendant City of New York has Failed to Train, Supervise, Discipline, and Otherwise Take Measures to Stop this Unlawful Conduct from Occurring**

83.    NYPD's response to the Protests was not unique. For at least the last two decades, the NYPD has engaged in the same unlawful policies and practice of using excessive force and unlawful arrests to suppress large-scale protests. This misconduct is widely documented in prior lawsuits, complaints, and reports.

84.    Following a 2003 anti-war protest, an investigation by the New York Civil Liberties Union (NYCLU) documented 198 accounts of excessive force by NYPD Officers, including the use of horses and batons to disperse crowds as well as indiscriminate pepper spraying. This investigation also documented the use of crowd control tactics such as physically preventing demonstrators from reaching their rally location, herding protesters into pens fashioned from metal barricades, and conducting mass arrests.[11]

85.    NYCLU documented similar unconstitutional practices at protests of the 2004 Republican National Convention ("RNC"). NYCLU received over 200 complaints from witnesses at the RNC protests and published a report finding that

---

[11]    N.Y. Civil Liberties Union, *Arresting Protest* (2003), https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.

the NYPD "severely undermined" protesters' rights through "mass arrests of hundreds of peaceful demonstrators and bystanders" and "the pervasive surveillance" of lawful demonstrators.[12]

86.    The CCRB, an independent NYPD oversight agency, conducted its own investigation and made similar findings regarding the RNC protest in a published report. CCRB found that then-Deputy Chief Monahan and another deputy chief failed to make their orders to disperse sufficiently audible, understandable, or with enough time to allow protesters to leave before effecting arrests, resulting in the mass arrest of nearly 250 protesters.

87.    Following large-scale demonstrations in downtown Manhattan in 2011, known as the "Occupy Wall Street" protests, the Protest and Assembly Rights Project issued a 2012 report detailing 130 complaints of excessive or unnecessary force against protesters, bystanders, lawyers, legal observers, and journalists. These claims included over a dozen instances where officers interfered with independent monitoring by journalists and legal observers by threatening to or in fact arresting them, and the repeated use of kettling against peaceful protesters, which "inflamed

---

[12]   N.Y. Civil Liberties Union, *Rights and Wrongs at the RNC* (2005), https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

tensions," "caused confusion and panic," and "chilled ongoing and future protest activity."[13]

88.     In October 2015, the NYPD Office of the Inspector General ("NYPD-OIG") issued a report assessing the NYPD's use of force. It found that (1) the NYPD's "use-of-force policy was vague and imprecise, providing little guidance to individual officers on what actions constitute force and providing insufficient instruction on de-escalation"; (2) the "NYPD's training programs did not adequately focus on de-escalation"; and (3) the "NYPD frequently failed to impose discipline even when provided with evidence of excessive force."

89.     Despite repeated notice about the NYPD's shortcomings in lawfully policing protests and the NYPD-OIG's own report on training deficiencies in connection with the use of force, the NYPD's recent conduct demonstrates that the City failed to correct these practices and adequately train its officers on constitutional policing during protests.

---

[13] Protest & Assembly Rights Proj., *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (2012), https://cdn.theatlantic.com/static/mt/assets/politics/Suppressing%20Protest.pdf.

90.     This was confirmed by a December 2020 DOI Report[14], which found that prior to the Protests, the NYPD lacked standardized, agency-wide, in-service training related to policing protests.

91.     The DOI Report specifically found that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[15]

92.     Similarly, a December 2020 report by the NYC Corporation Counsel uncovered that the NYPD failed to conduct "any protest-related after action-review" between (at earliest) the 2004 RNC protests and the Protests.[16]

93.     After release of the NYC-DOI and Corporate Counsel reports, the City admitted that it failed to train NYPD officers in policing protests and to otherwise correct and prevent their misconduct.

94.     In a December 18, 2020 video statement posted on social media, New York City Mayor Bill de Blasio acknowledged that he "agree[d] with [the NYC-

---

[14] *See supra* n.7.

[15] *Id.* at 36.

[16] New York City Law Department, Corporation Counsel Report (Dec. 2020), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

DOI's] analysis" and with its recommendations. He confirmed that New York City Police Commissioner Dermot Shea also agreed. He further admitted that "there were things that happened that were not about whether someone made the individual mistake, there were choices made, strategic choices, that weren't good choices it turns out; that end up causing problems. And we have to come to grips with that. We have to train our police force differently."

95.     NYPD leadership also admitted that it failed to prepare NYPD Officers for the Protests. Now-retired NYPD Chief of Department Terence Monahan admitted after the Protests that "[a] lot of cops had not received disorder trainings since they first came on the job."

96.     This failure predictably led to constitutional violations. As NYPD Chief of Patrol Juanita Holmes stated in October 2020 about the Protests: "[i]f [the officers] [saw] something that they perceived to be a violation of the law, they arrested that person, not realizing that protests are allowed—that peaceful protests are allowed." She further admitted that "we had officers that did things that never should have been done; that's not in alignment with what we stand for as agency."

97.     Upon information and belief, the City has not disciplined the vast majority NYPD Officers who engaged in misconduct during the Protests.

**CLAIMS FOR RELIEF**

22

## Claim I: Excessive Force

*Against Defendants City of New York, NYPD Captain Tarik Sheppard,*
*and John Doe #1*
*Fourth and Fourteenth Amendment, 42 U.S.C. § 1983*

98.     Plaintiff realleges the preceding paragraphs as if set forth here.

99.     Defendants NYPD Captain Tarik Sheppard and John Doe #1, acting under color of state law, used objective unreasonable force against Plaintiff Holloway, proximately causing injury.

100.   NYPD's practice and custom of using unreasonable force against protestors has and continues to be so persistent and widespread that it practically has the force of law, constituting a policy of Defendant City of New York. Moreover, despite being aware of the NYPD's repeated use of excessive and unlawful force at protests, Defendant City of New York failed to train, supervise, discipline, or otherwise control NYPD officers, which constitutes deliberate indifference to the rights of protestors, including Plaintiff Holloway.

101.   Defendant City of New York's policy, custom, or usage of using excessive, unjustified, and unreasonable force when policing protests was the moving force behind Plaintiff Holloway's injuries.

102.   As a direct and proximate result of Defendants' policies and unlawful conduct, Plaintiff Holloway suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

103.   Defendants John Does #1 and #4's conduct was willful, wanton, and reckless, and of such a nature that punitive damages should be imposed against them.

**Claim II: Unlawful Seizure and False Arrest**
*Against Defendants City of New York and John and Jane Does #1-3*
*Fourth Amendment, 42 U.S.C. § 1983*

104.   Plaintiff reallege the preceding paragraphs as if set forth here.

105.   Defendants John and Jane Does #1-3, acting under color of state law, seized, detained, and arrested Plaintiff Holloway, restricting her freedom of movement, without privilege or lawful justification.

106.   Defendants could not reasonably believe that they had lawful cause to seize, detain, or arrest Plaintiff Holloway.

107.   Plaintiff Holloway was conscious of her confinement by Defendants.

108.   Plaintiff Holloway did not consent to confinement by Defendants.

109.   Thus, Defendants did not have suspicion or cause to seize, detain, or arrest Plaintiff Holloway.

110.   NYPD's practice and custom of unlawfully seizing, detaining, and arresting individuals at protests has and continues to be so persistent and widespread

that it practically has the force of law, constituting a policy of Defendant City of New York. Moreover, despite being aware of the NYPD's use of unlawful seizures, detentions, and arrests at protests, Defendant City of New York failed to train, supervise, discipline, or otherwise control NYPD officers, which constitutes deliberate indifference to the rights of protestors, including Plaintiff Holloway.

111.   Defendant City of New York's policy, custom, or usage of unlawfully seizing, detaining, and arresting individuals at protests was the moving force behind Plaintiff Holloway's injuries.

112.   As a direct and proximate result of Defendants' policies and conduct, Plaintiff Holloway was deprived of liberty, suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

113.   Defendants John and Jane Does #1-3's conduct was willful, wanton, and reckless, and of such a nature that punitive damages should be imposed against them.

### Claim III: False Arrest and Imprisonment
*Against Defendants City of New York and John and Jane Does #1-3*
*New York State Constitution, Article I, § 12 and New York State Law*

114.   Plaintiff realleges the preceding paragraphs as if set forth here.

115.   Defendants John and Jane Does #1-3, who were acting within the scope of their employment with Defendant City of New York, seized, detained, and arrested Plaintiff Holloway, restricting her freedom of movement, without privilege or lawful justification.

116.   Defendants could not reasonably believe that they had lawful cause to seize, detain, or arrest Plaintiff Holloway.

117.   Thus, Defendants did not have reasonable articulable suspicion or individualized probable cause to seize, detain, or arrest Plaintiff Holloway.

118.   Plaintiff Holloway was conscious of her confinement by Defendants.

119.   Plaintiff Holloway did not consent to confinement by Defendants.

120.   As a direct and proximate result of Defendants' conduct, Plaintiff Holloway was deprived of liberty, suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

121.   Defendants committed these tortious acts within the scope of their employment, and therefore Defendant City of New York, as their employer, is responsible for their tortious conduct under the doctrine of respondeat superior.

### Claim IV: Assault and Battery
*Against Defendants City of New York, NYPD Captain Tarik Sheppard,*
*and John Doe #1*
*New York State Law*

122.   Plaintiff reallege the preceding paragraphs as if set forth here.

123.   Defendants NYPD Captain Tarik Sheppard and John Doe #1, who were acting within the scope of their employment with Defendant City of New York, knowingly, intentionally, and willfully committed assault and battery against Plaintiff Holloway.

124.   Defendants knowingly, intentionally, and willfully placed Plaintiff Holloway in apprehension of imminent harm and offensive bodily contact.

125.   Defendants knowingly, intentionally, and willfully made an offensive contact against Plaintiff Holloway without privilege or consent.

126.   The assault and battery was without cause or justification, and was not the result of a lawful arrest.

127.   Plaintiff Holloway did not consent to the offensive contact.

128.   As a result of Defendants' conduct, Plaintiff Holloway was placed in apprehension of imminent harm and offensive bodily contact and was subject to offensive bodily contact.

129.   As a direct and proximate result of Defendants' conduct, Plaintiff Holloway suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

130.   Defendants committed these tortious acts within the scope of their employment, and therefore Defendant City of New York, as their employer, is responsible for their tortious conduct under the doctrine of respondeat superior.

### Claim V: Negligent and Intentional Infliction of Emotional Distress
*Against Defendants City of New York, NYPD Captain Tarik Sheppard,*
*and John and Jane Does #1-3*
*New York State Law*

131.   Plaintiff reallege the preceding paragraphs as if set forth here.

132.   Defendants NYPD Captain Tarik Sheppard and John and Jane Does #1-3, who were acting within the scope of their employment with Defendant City of New York, intentionally and without justification assaulted, battered, detained, and arrested Plaintiff Holloway. Defendants acted recklessly and with utter disregard for the consequences of their actions, which caused severe emotional distress to Plaintiff Holloway.

133.   Defendants' actions exceeded all reasonable bounds of decency, were outrageous and shocking, and resulted in severe emotional distress, and other injuries, to Plaintiff Holloway.

134.   Defendants committed these tortious acts within the scope of their employment, and therefore Defendant City of New York, as their employer, is responsible for their tortious conduct under the doctrine of respondeat superior.

## Claim VI: Negligence
*Against Defendants City of New York and John and Jane Does #1-50*
*New York State Law*

135.   Plaintiff reallege the preceding paragraphs as if set forth here.

136.   Defendants NYPD Captain Tarik Sheppard and John and Jane Does #1-50 owed a special duty of care to Plaintiff Holloway, whom they injured and/or witnessed being injured by other NYPD Officers. Defendants violated this special duty by failing to intervene to prevent injury, and by failing to seek and/or provide medical aid.

137.   NYPD Officers' negligent failure to intervene and seek and/or provide medical aid to Plaintiff Holloway caused her further injury.

138.   Defendants committed these tortious acts within the scope of their employment, and therefore Defendant City of New York, as their employer, is responsible for their tortious conduct under the doctrine of respondeat superior.

## Claim VII: Negligent Supervision, Retention, and Training
*Against Defendant City of New York*
*New York State Law*

139.   Plaintiff reallege the preceding paragraphs as if set forth here.

140.   Defendant City of New York failed to use reasonable care in the training and supervision of the NYPD Officers who assaulted, battered, falsely

imprisoned, negligently injured, and violated the constitutional rights of Plaintiff Holloway.

141.   As a direct and proximate result of Defendant's negligence, Plaintiff Holloway suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

CLAIMS FOR RELIEF

**WHEREFORE**, Plaintiffs demand the following relief against Defendants:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages against all Defendants except the City of New York in an amount to be determined at trial;

c. Reasonable costs and attorneys' fees under 42 U.S.C. § 1988;

d. Pre- and post-judgment interest to the fullest extent permitted by law; and

e. Any additional relief the Court deems just and proper.

DATED: this 2nd Day of May 2023                    New York, New York

_____
         /s/
Akeeb Dami Animashaun
 14 Wall Street, Suite 1603
New York, NY 10005
929.266.3971
animashaun@pm.me

_____
Masai I. Lord
Lord Law Group
14 Wall Street, Suite 1603
New York, NY 10005
718.701.1002
mlord@lordlawgroup.com

*Counsel for Plaintiff Alexandria Holloway*